IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 1, 2021

**IN RE CYRIC W.**

**Appeal from the Juvenile Court for Williamson County**
**No. 36820-2020-JT-8      Sharon Guffee, Judge**

_____

**No. M2021-00410-COA-R3-PT**
_____

This appeal involves a petition to terminate parental rights. The juvenile court found by clear and convincing evidence that five grounds for termination were proven: (1) abandonment by failure to support; (2) abandonment by failure to provide a suitable home; (3) substantial noncompliance with a permanency plan; (4) persistent conditions; and (5) mental incompetence. The juvenile court also found that termination was in the best interests of the child. The mother appeals. We reverse the trial court in part and affirm in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed in Part and Affirmed in Part**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and FRANK G. CLEMENT, JR., P.J., M.S., joined.

David M. Jones, Franklin, Tennessee, for the appellant, Anna K. W.

Herbert H. Slatery, III, Attorney General and Reporter, and Kathryn A. Baker, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

### I.    FACTS & PROCEDURAL HISTORY

Anna K. W. ("Mother") is the biological mother of three children: Tristan, Cyric, and Castiel. The three children all have different fathers. This case only concerns the termination of Mother's parental rights as to her middle child, Cyric. In 2017, the Department of Children's Services ("DCS") became involved with the family after an

incident where Mother inadvertently set her youngest child, Castiel, on a hot ceramic cooktop. As a result, Castiel suffered second-degree burns on his bottom, but the treating physician did not have concerns of non-accidental trauma. On September 20, 2017, Castiel's father filed a petition for dependency and neglect. Castiel's father also filed for an emergency restraining order to obtain custody of Castiel, which described concerns regarding the burns on the child's bottom, concerns about Mother's home being unclean and cluttered, and concerns about Mother's mental and emotional health. Pursuant to an ex parte restraining order, Mother was required to deliver Castiel to the care and control of his father pending a preliminary hearing. After initially not complying with the order, Mother ultimately delivered Castiel to his father on September 25, 2017. At the preliminary hearing on October 9, 2017, the juvenile court placed Castiel in his father's custody.

On September 29, 2017, CPSI Brittany Benefield and a detective with the sheriff's department conducted a random visit to Mother's home. After knocking on the front door and receiving no response, the detective observed behavior that caused him to draw his gun and call for additional assistance. However, Mother eventually allowed them in the home after Ms. Benefield contacted Mother's attorney. Throughout this visit, Mother exhibited bizarre, hostile, and argumentative behavior, made demeaning and mocking comments toward Ms. Benefield, and failed to allow DCS to conduct a full investigation of her home. DCS became concerned about the safety of the two remaining children because Mother refused to allow access to parts of her home and refused to allow Ms. Benefield to speak with the children. Thereafter, on October 3, 2017, DCS filed a petition for dependency and neglect, for an order controlling conduct, and for protective supervision as to all three of Mother's children. Mother filed an answer, in which she denied that her children were dependent and neglected, and requested that the juvenile court dismiss the petition. During this time, Ms. Rhonda Franks became involved as the court-appointed special advocate ("CASA"), and Ms. Katrin "Katy" Miller was appointed by the juvenile court as Guardian ad Litem.

The adjudicatory hearing for DCS's petition was set for November 2017, but the matter was reset after the judge recused herself. In February 2018, a new judge was designated to preside over the proceedings, and the court entered an order setting an adjudicatory hearing for April 2018. Around this time, Tristan's father became involved when he filed an intervening petition for emergency custody of Tristan and for a restraining order. In April 2018, the juvenile court entered an order detailing the parameters of Mother's supervised visitation with Castiel and continuing the adjudicatory hearing on all the petitions. The order specifically stated the following:

1. DCS shall ensure that Mother is provided with four hours per week of supervised visitation with the minor child, Castiel [W.] The visitation shall take place in Mother's home.
2. Because there will be a professional in the home each week to supervise

visitation, the Court's previous order that the DCS case manager visit the home on a weekly basis to check on the welfare of the children shall be lifted.

3. The parties stipulate that Todd [S.] is the biological father of Castiel [W.], but the Court reserves all other issues related to parentage, including custody, visitation, and child support.

4. Pending further orders, Todd [S.] shall be responsible for making medical decisions for Castiel. However, Mother may make emergency medical decisions in the event that an emergency occurs during one of her visitations.

5. The Adjudicatory Hearing on all the Petitions shall be continued to a date to be determined based upon the schedule of the Court and all parties.

Afterward, Tristan and Cyric remained in the Mother's custody. Before visitation was arranged to take place at her home in April 2018, Mother attended visitation at the DCS office. During supervised visitation at her home, Mother was described as standoffish, not interacting with Castiel, and even preventing Castiel from interacting with his two older brothers.

The adjudicatory hearing was held on July 5, 2018, July 12, 2018, October 10, 2018, and October 12, 2018. In April 2019, the juvenile court issued its findings of facts and conclusions of law as to dependency and neglect for all three children. The juvenile court concluded as follows:

> [T]here are severe and serious conditions of real, actual, and significant harm to the children's physical, emotional, mental, and educational well-being. For reasons of these harms, the children are dependent and neglect[ed] within the meaning of Tennessee Code Annotated § 37-1-102(b)(13).

The juvenile court directed the attorney for DCS to draft and submit an order to the court. In June 2019, the juvenile court entered an adjudicatory order declaring the three children to be dependent and neglected, which was then amended in July 2019. The juvenile court found that Tristan's father, Castiel's father, and DCS met their burden of proof by clear and convincing evidence. Among other things, the juvenile court found that Mother failed to provide documentation establishing that the children were enrolled in homeschool, failed to obey court orders, and lacked credibility as a witness. The juvenile court found that the facts of the case supported a finding of dependency and neglect pursuant to Tennessee Code Annotated sections 37-1-102(b)(13)(B), (C), and (G). After a dispositional hearing, the juvenile court placed Cyric in the custody of DCS and he entered foster care. The juvenile court granted custody of both Tristan and Castiel to their respective fathers. In its dispositional order, the juvenile court stated that it had "grave concerns over [Mother's] lack of veracity" and described Mother as "cold and hard as an iron wedge" toward her children. Around this time, Ms. Deja Shaw was assigned as the DCS case manager for

Cyric's case.

On September 11, 2019, DCS developed a permanency plan for Mother. Pursuant to that plan, Mother went ahead and completed the recommended parenting assessment. The parenting assessment noted that Mother was alert, calm, focused, and engaged in appropriate communication. In its conclusion and summary, the parenting assessment stated that Mother desired reunification with her children. The juvenile court then held a hearing on Mother's permanency plan. On November 1, 2019, the juvenile court entered an order ratifying Mother's permanency plan. Mother's responsibilities are summarized as follows:

1. Complete a psychological evaluation and follow reasonable recommendations of the evaluation;
2. Submit to a hair follicle drug test;
3. Submit to random drug screens twice per month;
4. Complete parenting education provided by DCS to address age appropriate discipline, age appropriate parenting techniques, understanding Cyric's mental, emotional, and physical health needs, and issues recommended by the parenting assessment or psychological evaluation;
5. Complete a parenting assessment and follow reasonable recommendations of the assessment;
6. Demonstrate age appropriate discipline and understanding of age appropriate parenting techniques;
7. Display an understanding of all of Cyric's mental, emotional, and physical health needs and an understanding of the importance of appointments;
8. Be free of any criminal activity and not incur any additional charges;
9. Resolve all current and pending legal issues and follow all valid court orders;
10. Attend and participate in all child and family team meetings (CFTMs), court hearings, and foster care review boards, and continue to communicate with DCS and other team members;
11. Allow DCS and CASA to conduct a walkthrough of her home prior to the start of any Trial Home Visit to ensure that it is appropriate for Cyric to return, and comply with the home study process;
12. Ensure that anyone residing in her home over the age of 18 will be able to pass a background check to ensure that Cyric is appropriately cared for and supervised;
13. Disallow illegal activity in her home;
14. Obtain and maintain appropriate housing with adequate size and furnishing for the family, and be able to provide a copy of the lease to DCS for verification;
15. Ensure that her home has plumbing and access to clean running water and utilities, meets fire hazard prevention standards, and meets minimal housing keeping standards;
16. Comply with the plan and notify DCS or the service provider in a timely manner if she is unable to visit, arrive on time to visits, and contact DCS and the Omni visitation supervisor between twenty-four and forty-eight hours prior to scheduled

visits to confirm whether or not she plans to attend the visit;

17. Interact and engage with Cyric in appropriate activities during visits and promote a positive environment during visits; and

18. Participate in supervised visitation at a minimum of four hours per month, and contact DCS and the Omni visitation supervisor between twenty-four and forty-eight hours prior to scheduled visits to confirm whether or not she plans to attend the visit.

Throughout this case, the plan was revised, but Mother's tasks never materially changed and the expectations for her were the same. Ms. Franks and Ms. Miller remained in their roles as CASA and Guardian ad Litem with respect to Cyric.

In November 2019, Mother was ordered to pay retroactive child support for Cyric in the amount of $1,016.00 to be paid at $25.00 per month, and her payment for current child support for Cyric was set at $259.00 per month. After Mother missed two payments toward both her retroactive and current child support, DCS filed a petition against Mother for contempt for failure to comply with an order of child support. As of January 2020, Mother' total arrearage had accumulated to $1,534.00. Thereafter, DCS also filed a motion for an order approving psychotropic medication for Cyric after Mother refused to consent to Cyric taking the prescribed medication, and a motion to ratify a revised permanency plan. In March 2020, the juvenile court entered an order ratifying Mother's revised permanency plan, in which she was now responsible for participating in all required meetings in person and she was now allowed to complete her drug screens at the detention center. Mother was also required to sign releases of information for DCS and return all necessary phone calls, emails, and notifications by service providers within twenty-four to forty-eight hours. Mother also signed the DCS form which sets forth the criteria and procedures for the termination of parental rights. In the order ratifying the permanency plan, it was noted that DCS would provide Mother with the contact information for Cyric's doctor so Mother could discuss the recommendation of psychotropic medication for Cyric. In March 2020, the juvenile court entered two separate orders on the issue of contempt for nonpayment of child support. The juvenile court ordered an attachment pro corpus to be issued for Mother's arrest and set bond for $500.00. Afterward, the attachment was recalled, and the juvenile court entered an order finding Mother in contempt and sentenced Mother to serve a total of thirty days for three child support violations. The juvenile court noted in its order that Mother was allowed to pay $100.00 per month with the difference accruing, and an income assignment was ordered upon notice that Mother obtained employment where income assignment was available. As of February 2020, Mother's total arrearage had accumulated to $1,793.00.

In March 2020, clinical psychologist Dr. Barbara Kay conducted a psychological evaluation of Mother. In her report, Dr. Kay described Mother as "hypervigilant," "persecutory," "moderately anxious," "[having a] flow of thought [which] was obsessive," "manic," "hostile and guarded," and "depressed with stable affect." Dr. Kay also

recognized that Mother was likely to appear grim, cheerless, and serious-minded with strong feelings of insecurity that were evident in her tendency to downgrade herself, to distance herself from others, and to anticipate rejection. Dr. Kay's diagnostic impressions of Mother were listed as obsessive-compulsive personality disorder with schizoid[1] features, major depression (recurrent, severe, without psychotic features), and generalized anxiety disorder. Furthermore, Dr. Kay noted that Mother was placed in DCS care when she was thirteen years old due to dependency and neglect, and she lived in three to four foster homes while in DCS custody. Dr. Kay noted that Mother was prescribed medications while in DCS custody, but no longer takes them. As a result of the evaluation, Dr. Kay recommended the following:

1. Mother should receive one-on-one therapy to address her major depression and generalized anxiety disorder;
2. Mother should be evaluated for medication management if deemed necessary;
3. Mother should receive on-on-one therapy to address her issues related to relationships with others, trauma from domestic violence, and tendency to become involved with men who abuse her children and encourage her to engage in a destructive lifestyle;
4. Mother should attend parenting classes that address appropriate expectations, child development issues, and help her develop empathy and the ability to be aware of her children's needs, feelings, and state of being; and
5. Mother should be routinely screened for drug use/abuse.

Dr. Kay concluded that Mother's lack of cooperation with DCS brought into question how much she really wants custody of Cyric and whether she would be willing or able to meet the needs of her son if she obtained custody.

In June 2020, the juvenile court entered an order approving extraordinary medical care for seven-year-old Cyric. Cyric had fluid build-up behind his ears causing him to have hearing difficulties, which also caused him to have delays in his speech. Furthermore, because of the fluid build-up behind his ears, Cyric was experiencing headaches, severe congestion, and difficulty breathing and sleeping. Despite these circumstances, Mother refused to provide consent for ear surgery. Therefore, the juvenile court made a finding that the surgery was in the best interests of the child and ordered the approval of the surgery. Around this time, the juvenile court also made a finding that Cyric needed mental health counseling and ordered that he should receive mental health services. In August 2020, Cyric began individual counseling with Ms. Winter Pavone.

On July 21, 2020, the juvenile court entered an order approving a revised permanency plan for Mother. The permanency plan's responsibilities were virtually

---

[1] Dr. Kay explained that "schizoid" referred to people who like to keep to themselves, and does not have anything to do with schizophrenia.

identical to Mother's previous plans, with the exception that Mother was now required to provide evidence of a source of income to DCS. In conjunction with the list of responsibilities on this plan, there were notes in handwriting concerning Mother's progress with each of her responsibilities. The juvenile court noted in the order that Cyric's foster parents testified at the permanency hearing that Cyric had made disclosures to them of physical abuse and neglect, in which Cyric described being locked in a room without food by Mother. Mother also signed the DCS form which sets forth the criteria and procedures for the termination of parental rights again. On July 27, 2020, DCS filed a petition to terminate the parental rights of Mother and Cyric's father.[2]

In December 2020, the juvenile court found Mother in contempt for nonpayment of child support for a second time. In January 2021, an attachment pro corpus was issued by the court for Mother's arrest. The hearing on the petition to terminate parental rights occurred on February 24, 2021, through February 26, 2021.[3] Mother was arrested the first day of the hearing, and the juvenile court ordered Mother to serve concurrent terms of forty and thirty days in jail for two child support violations unless she could post bail in the amount of $1,085.00. On the second day of the hearing, the juvenile court noted that it was clear that Mother had incurred charges because she was in handcuffs on the previous day. However, Mother was released the same day she was arrested after posting bail.

At the hearing, Dr. Kay testified as to Mother's behavior during the psychological evaluation. Dr. Kay testified that Mother was persecutory, negative, and hostile; talked obsessively; and appeared manic and hypervigilant. Dr. Kay noted that Mother appearing manic was rare and something she did not see very often in her patients. She explained that this behavior could be a problem because children require a lot of attention and if Mother was obsessively focused on external factors of her life then she would be unable to turn her attention to her children. As for Mother's parenting component, Dr. Kay testified that Mother scored high on the factor of having unrealistic or inappropriate expectations of her children. Dr. Kay explained that "that's a situation that can become volatile very easily if you have unrealistic expectations of what the child is able to do." Dr. Kay also clarified

---

[2] Cyric's birth certificate does not provide a name for his father. Mother named a potential alleged father of Cyric, and DCS searched and located someone by the name provided by Mother. He denied knowing Mother or the child, and asked that DCS not contact him anymore. In November 2020, DCS filed a motion for service by publication for the father along with an affidavit of diligent search. The juvenile court ordered that if the father did not enter an appearance or otherwise answer the petition, further personal service or service by further publication should be dispensed with and service of any further notices, motions, orders, or other legal documents in this matter may be made upon the father by filing same with the juvenile court clerk of Williamson County, Tennessee. Proof of publication was provided thereafter. In January 2021, the juvenile court entered a final order terminating the parental rights of Cyric's father and a final decree of partial guardianship.

[3] Another permanency plan was developed around this time. On February 2, 2021, the juvenile court set a hearing for ratification of the permanency plan for February 24, 2021, but there is no order in the record provided on appeal that shows the plan was actually ratified. Mother did, however, sign the DCS form which sets forth the criteria and procedures for the termination of parental rights again.

that unrealistic or inappropriate expectations are not to be confused with high expectations:

> A lot of people have high expectations of their children, but inappropriate expectations are doomed to failure, especially because the parent . . . oftentimes will become frustrated . . . . But yes, I mean, certainly in all situations, not everybody who has inappropriate expectations would necessarily abuse their children physically.

Dr. Kay noted that the fact that Mother refused drug screens, would not allow the school to do an individualized education plan (IEP) on Cyric, and would not allow Cyric to get medication for ADHD were "major red flags." Dr. Kay was concerned about suspected drug use, and stated that a parent cannot parent if he or she is using drugs. Furthermore, Dr. Kay was concerned with the fact that Mother had still not completed all of her recommendations: "That would concern me as to how motivated she is to get herself stable enough to take care of her kids, on one hand, if she wanted to take care of them; and on the other hand, how invested she is in meeting the needs of her children." However, despite her diagnostic impressions of Mother, Dr. Kay explained that people with these disorders are capable of properly parenting a child. Dr. Kay testified that there are plenty of people who are depressed and anxious that parent children, but "normally" it would help if they were in therapy or medicated. She added, "I didn't say [Mother] couldn't care for her children, but I did recommend therapy."

Ms. Franks testified that she became involved as the CASA in October 2017. Thereafter, Ms. Franks and Ms. Miller completed an initial visit to Mother's home in November 2017. Mother lived at the home of her uncle and aunt, and had lived there with her children for a number of years before DCS became involved. Mother had a background in caregiving and was paid by her aunt to care for Mother's disabled uncle. Ms. Franks testified that this was Mother's source of income. At the time of the initial home visit, Castiel was with his father, but Tristan and Cyric were still with Mother. Ms. Franks testified that Mother's demeanor during the initial visit was very rude and disrespectful. Ms. Franks described the home as smelling of cigarette smoke and crowded with items in the foyer, in the bathroom, and on the countertops. She also explained that she was especially concerned about Cyric's sleeping situation. Ms. Franks observed that Cyric, at nearly five years old, still slept in a crib, which was covered with a mesh-like net so that he could not get out.[4] Ms. Franks testified that she was supposed to see the children at least once a month; however, she was not able to complete any more home visits because her calls, emails, and texts to Mother went unanswered.

As for Mother's supervised visits with Castiel, which occurred before Tristan and Cyric were removed from Mother's custody in July 2019, Ms. Franks testified that it was hard and that Mother was slow and nonresponsive. Ms. Franks testified that she never

---

[4] Ms. Franks later explained that this mesh-like net that covered the crib was commercially available.

witnessed much attentiveness toward the children from Mother, and Mother was cold and unemotional from the very first visit. She described visitation as follows:

> [Mother] hardly acknowledged Cas at the visits. She wouldn't touch him, wouldn't hug him, even though he would try to talk to her, communicate with her, she just put a wall up and refused to show any kind of emotion or love towards him.
>
> The brothers had fun playing with him, but then she would even direct the older boys to not play with him and to sit on the couch, and then Cas would end up just playing by himself with the toys in the room.
>
> Later, at some of the other visits, sometimes she would bring things. She would bring food for the older boys. She wouldn't bring food for Cas. Still no emotion. She wouldn't talk to him. So it was hard.

Ms. Franks also testified that Mother was late for most of the visits at the DCS office and would often leave early without telling Castiel goodbye. Ms. Franks testified that when Mother learned that Castiel's father brought a birthday cake and a gift for the older brothers for a visit, Mother cancelled the visit. Ms. Franks testified that Castiel was excited to give his brothers their birthday cake and a gift, and after the visit was cancelled, Castiel was disappointed and could not understand what he had done to make Mother cancel the visit. Ms. Franks continued to testify as to Mother's behavior toward Castiel:

> He would be excited before she got there, and when she got there and when she would walk in the door and he would — she would not acknowledge Cas, and immediately you could just see the let down [sic], and he would just sort of withdraw inside himself and just be quiet. And then even when his brothers would want to hug him and tell him hello, [Mother] would even stop the older brother from hugging him, so just very sad.

Ms. Franks described Mother's interactions with Cyric as cold, but not as cold as she was with Castiel. Ms. Franks further testified that Mother argued with other adults that were present every time visitation occurred. Mother argued about how clean the room was, what was in the room, and who was attending the visitation.

In the summer of 2018, Ms. Franks stopped attending visitation because Mother would refuse to come and visit with the children if Ms. Franks was there. Ms. Franks was concerned that her presence would penalize the children so she decided to stop attending visitation because of the conflict, although she explained to Mother that she had a court order to be there. Ms. Franks also testified that when Cyric was placed in DCS custody in July 2019, he was not enrolled in school at the time. Once Cyric entered into foster care, Ms. Franks explained that he was a different child; opened up; was very friendly, happy,

and talkative; and would answer any question asked of him. However, when he entered foster care, Ms. Franks had concerns about his speech: "It was very hard to understand him, and I remember at the foster care review boards, I would sit next to him . . . and they would ask him questions and I would sort of have to decipher what he was saying . . . ." Ms. Franks continued to explain that it was later determined that Cyric's hearing problem was the reason for his problems with his speech. Ms. Franks testified that doctors recommended surgery to improve his hearing, but DCS had to obtain a court order approving the surgery because Mother refused to consent to it. Since then, Ms. Franks testified that his speech improved, "he is a normal, happy eight-year-old now," and "I can understand every word he says." Ms. Franks explained Cyric's progression in foster care as follows: "He's doing very well. He's in school now. He loves school. He loves his teacher. Turned out he's an above-average child, doing very well in . . . every class. Very respectful. Respectful at home, respectful at school. He has lots of friends. He's doing just great."

As for Mother's progression, Ms. Franks testified that she had seen no improvement at all and that things had actually gotten much worse. Ms. Franks explained that Mother did not care about the medical needs, the emotional needs, and the educational needs of any of the children; nor did she complete the tasks required of her to visit her children. Ms. Franks testified that Mother had not had any visitation with Cyric since he was placed in foster care because she had failed to complete those tasks. Consequently, none of the children were residing with Mother and none of the children were engaging in visitation with Mother. Ms. Franks testified that her greatest concern was as follows:

> My greatest concern is the emotional point of it, I believe, is where there's — she's never shown any emotion for the children. The neglect on her part to do what she needed to do — to see her boys, to get her boys back. She's not signed any of the things that needed to be signed for the medical releases in order for them to get the care they needed.

In conclusion, Ms. Franks testified that she was concerned about Cyric potentially returning to Mother's care because of her emotional neglect, her educational neglect, and her suspected drug abuse. Ms. Franks explained that Mother had tested positive for drugs in the past and missed many of the drug screens she had been contacted to report for.

Ms. Pavone testified about her work with Cyric as his foster care counselor. She testified that the two main things that they worked on in counseling were increasing Cyric's emotional vocabulary and addressing possible attachment issues. Ms. Pavone explained that Cyric struggled to identify and express his emotions and that Cyric had difficulties attaching to adults. Ms. Pavone also explained that Cyric struggled with accepting responsibility for things he did because of his fear of facing the consequences. Ms. Pavone testified about Cyric's expressions regarding Mother:

[W]e looked for things that make us happy and happy memories, things that make us sad and sad memories. And when we were talking about happy memories, he really struggled to identify positive memories with [Mother]. He did identify one memory . . . . But other than that, he just wasn't really able to identify any positive memories.

And then we went over the [sad] part and I asked about, you know, one of his saddest memories, he stated that there was one time when he was locked in his room for two days, and he knew he wasn't going to get to eat, and he didn't get to eat. And so that was like one of his saddest memories.

Ms. Pavone explained that Cyric remembered Mother being especially mad at him that day and locking him in his room for those two days with only a training potty to use the restroom. Cyric described a lock being on the outside of his door that was so high he would be locked in the room. He also described being stuck in his crib with the mesh-like net over it and his attempt to figure out how to open the zipper so he could get out. Ms. Pavone also testified that she discussed with Cyric what punishment and consequences looked like from his perspective:

[H]e said that his consequences were that he would be told he couldn't eat. So if you don't do X, you won't get to eat for the rest of the day or he would get spankings. And he said spankings, it was never with anything other than a hand, so no belt or other tools were used. . . . [W]hen he would get spanked . . . he couldn't identify the exact number, but it wouldn't be two or three swats. It would be, you know, more like six, seven, or up. And he said that [Mother] would be very angry. And I asked him where on his body he had been spanked, and he identified his legs, his bottom, his back, and his arms. And he just said it's just . . . wherever she wanted to that day, like whatever she wanted.

Furthermore, regarding parental affection, Ms. Pavone testified that Cyric stated that Mother stopped being affectionate toward him after she confined him to his room.

Ms. Pavone testified that Cyric does not have the typical attachment with his foster parents as a child his age. Compared to a child his age who wants and needs a certain amount of physical touch, Cyric was "almost physically uncomfortable" when Ms. Pavone gave him her first hug. Ms. Pavone explained that now Cyric is starting to embrace the benefits of physical touch. Ms. Pavone also testified that when she would ask questions about "mom," Cyric would ask "which mom?" which demonstrated that Cyric's default would not go to Mother being "mom." Although, Ms. Pavone explained that Cyric does not actually call his foster mother "mom." When asked if Cyric loved Mother, Ms. Pavone testified that although Cyric did talk about loving and missing her, Cyric's expressions sometimes just appeared to be the natural biological connection of a mother and son. Ms.

- 11 -

Pavone testified that Cyric has made progress with identifying his emotions and has improved because of his interactions with his brothers. Ms. Pavone testified that Cyric was initially off-putting, detached, and very black and white about missing his Mother, but now has improved and expressed more emotion since therapy began. Ms. Pavone testified that she has not had any contact with Mother other than the CFTM. However, after reaching out to Mother a week prior, Ms. Pavone testified that Mother communicated that she wanted to know more about the case and get more involved.

Ms. Shaw testified as the DCS case manager who was involved in Cyric's case since July 2019. In discussing the ground for failure to support, Ms. Shaw testified that Mother was aware of the consequences of not paying child support because they were explained to her by the juvenile court. Ms. Shaw testified that Mother was ordered to pay approximately $250 a month in child support for Cyric. Ms. Shaw explained that Mother only made three total payments of child support: $300.00 on December 28, 2020; $300.00 on November 19, 2020; and $216.66 on June 23, 2020. Ms. Shaw testified that Mother's only source of employment was with her aunt as a caregiver for Mother's uncle. Because of this arrangement with her aunt, Mother was not required to pay rent while she lived with her aunt. Ms. Shaw testified that Mother did not disclose how much money she was making because Mother stated that it was none of Ms. Shaw's business. However, in the juvenile court's dispositional order in August 2019, Mother's income was found to be $1,488.00 every other week. According to Ms. Shaw, Mother was not incarcerated or incapacitated during the relevant four-month period preceding the filing of the petition to terminate her parental rights.

As for the ground of failure to provide a suitable home, Ms. Shaw testified that addressing Mother's mental health was a primary concern. Ms. Shaw testified that DCS requested drug screens but Mother failed to report for those. After Mother failed to report for those, the juvenile court ordered Mother to complete the drug screens at the detention center. Still, when DCS typically requested two drug screens per month, Mother failed to report for the drug screens. Ms. Shaw testified that Mother communicated that she did not want to be drug screened by DCS. Ms. Shaw also testified that DCS attempted to set up a psychological evaluation for Mother, along with a parenting assessment, parenting education, and hair follicle drug screen. After asking Mother several times to sign a release of information, Ms. Shaw obtained the funding for the psychological evaluation in October 2019. However, Mother missed the thirty-day window to complete the evaluation. DCS again paid for the evaluation in February 2020, but the doctor cancelled after Mother twice failed to show up for the appointment she had scheduled. Mother was notified that she could not participate in visitation until she completed the psychological evaluation. The psychological evaluation was finally completed in March 2020 with Dr. Kay. Although Mother completed the psychological evaluation, Mother still did not participate in visitation with Cyric because she did not follow the recommendations of the psychological evaluation. As for the parenting assessment and parenting education, Ms. Shaw testified that Mother completed the parenting assessment in September 2019 and parenting

education in October 2019. After Mother completed the parenting assessment in September 2019, it was recommended that she complete additional parenting education in addition to the parenting education she would receive in October 2019. However, Mother would schedule an appointment, and when it was with someone she did not want, she would either not attend the appointment or would reschedule. Ms. Shaw testified that Mother did not complete additional parenting education until August 2020. Mother delayed its completion despite Ms. Shaw obtaining funding for the parenting education for every month from January 2020 until August 2020.

As for the ground of substantial noncompliance with the permanency plan, Ms. Shaw testified to whether Mother complied with the tasks on her plan. In order to address her mental health, Mother was required to complete a psychological evaluation and follow the recommendations. Ms. Shaw testified that Mother completed the psychological evaluation in March 2020, and that the report recommended that Mother complete individual therapy, participate in medication management, and continue to do random drug screening. Ms. Shaw testified that she discussed the evaluation and recommendations with Mother at CFTMs and in court. Ms. Shaw testified that Mother was not in compliance with the individual therapy recommendation. Although DCS was going to pay for this service, Ms. Shaw testified that Mother had not responded to her efforts to assist with the individual therapy. Ms. Shaw learned that Mother was scheduling appointments on her own with a service in Nashville but would cancel those appointments and not actually attend. Ms. Shaw notified Mother that she would need documentation from her individual therapy, but Mother failed to sign a release of information. As for the medication management recommendation, Ms. Shaw submitted a referral for Mother and contacted Mother to let her know that someone would be calling to set up an appointment. However, according to Ms. Shaw, Mother never scheduled an appointment.

Ms. Shaw also testified that Mother was not compliant with the task of completing random drug screens. Despite requesting two drug screens a month, Ms. Shaw explained that Mother only submitted to between three to five drug screens. Mother did not want to take drug screens with DCS, so the juvenile court offered Mother the alternative of reporting to the detention center for her drug screens. After the juvenile court offered her this alternative, Mother completed drug screens in March 2020 and July 2020, testing negative for both. Although DCS obtained funding for Mother's hair follicle drug screen in April 2020, Mother did not complete her hair follicle drug screen until June 2020. Mother tested negative, but Ms. Shaw testified that Mother delayed the test for several months. Ms. Shaw explained that it was a trend for Mother to complete tasks required of her right before going to court. Because of this delay, Ms. Shaw testified that she did not feel confident that the test accurately reflected Mother's substance abuse.

In order to address her ability to understand and provide for Cyric, Mother was required to display an understanding of all Cyric's mental, emotional, and physical health needs. Ms. Shaw testified that she did not feel that there was progress on that issue due to

- 13 -

the fact that DCS had to reach out several times to Mother in order to speak to Cyric's medical provider. Ms. Shaw also testified that Mother would not allow the school to do testing to determine if Cyric needed an IEP. After the juvenile court ordered Mother to talk to the school about the testing so that she could make an informed decision, Mother did not talk to the school and still refused to consent to the testing. Mother indicated that she would be open to testing, but she did not trust the school and wanted someone else to complete the testing at another school. Ms. Shaw testified that Mother's distrust was a common theme from the very beginning of DCS's involvement and was a reason that Mother gave for why she did not want to comply with the various tasks required of her. Ms. Shaw added that Mother's distrust was to a degree that it prevented her from meeting Cyric's needs and was a concern for DCS. This concern was further demonstrated in Mother's refusal to consent to Cyric's ear surgery. Mother refused to consent to Cyric's surgery despite the fluid build-up behind his ears causing him to have hearing and speaking difficulties, daily headaches, severe congestion, and trouble breathing and sleeping. Mother also refused to engage with doctors about recommendations that Cyric be prescribed medications for ADHD.

According to her permanency plan, Mother was required to remain free of criminal activity and not incur any additional charges. Ms. Shaw testified that Mother incurred additional charges with the contempt for nonpayment of child support. Mother was also required to notify DCS within twenty-four hours of being released if she did incur additional charges. Ms. Shaw testified that Mother did not comply with this requirement.

According to her permanency plan, Mother was required to attend and participate in CFTMs, court hearings, and foster care review board. Ms. Shaw testified that Mother complied with this requirement, although Mother would come late to those meetings and would never talk in the CFTMs. Ms. Shaw testified that Mother attended all but two meetings. At these meetings, Ms. Shaw reminded Mother of the tasks that she needed to complete and notified Mother about the status of services that DCS was providing her. As for Mother's communication, Ms. Shaw testified that it was nonexistent aside from sporadic emails. Ms. Shaw explained that she would email Mother and would not receive a response until two or three days later.

In order to ensure that she could provide safe and stable housing for Cyric, Mother was required to obtain and maintain appropriate housing and provide a copy of the lease to DCS for verification. Mother reported to Ms. Shaw that she lived in her aunt's home, and that was where she lived the entire time that Cyric was in foster care. Ms. Shaw testified that she was not aware of any type of lease agreement, but she knew that Mother was able to stay there as a caregiver for her uncle.[5] Because of this informal agreement, there was no documentation that Mother was able to provide to Ms. Shaw about her housing.

---

[5] Mother's uncle passed away July 28, 2020.

In her permanency plan, there were also requirements related to safe and stable housing and allowing DCS to conduct a walkthrough of the home. Although Mother communicated to the juvenile court that she would comply with a walkthrough of the home, Ms. Shaw was never able to complete a walkthrough. After emailing Mother twice to notify her of the home visit, Ms. Shaw attempted to complete a walkthrough of Mother's home on July 27, 2020; however, Mother would not allow Ms. Shaw to complete the walkthrough and told Ms. Shaw to leave the home. In regard to the attempted walkthrough, Ms. Shaw testified that the aunt invited them in the home, but Ms. Shaw never got past the foyer of the home. Ms. Shaw explained that she was confronted by Mother and asked to leave. From what she did observe, Ms. Shaw testified that the home was not appropriate. The home smelled of cigarette smoke, animal feces, and animal urine to the point it made Ms. Shaw physically ill. According to Ms. Shaw, Mother's uncle passed away the following day. Mother then emailed Ms. Shaw stating that the tension Ms. Shaw had caused by the visit the previous day killed her uncle. Ms. Shaw explained that she never saw Mother's uncle and did not even know what room he was in. Ms. Shaw testified that she spoke softly and did not yell, and that Mother was yelling at everyone else during the attempted walkthrough. Ms. Shaw concluded that Mother was not in compliance with the task related to safe and stable housing.

Regarding visitation, Ms. Shaw testified that Mother had been unable to engage in any visitation with Cyric once he entered DCS custody because she did not follow the recommendations of the psychological evaluation. Ms. Shaw testified that Mother was aware of what she needed to do to be able to have visitation with Cyric. However, Mother never asked about having visitation with Cyric, and Mother did not express to Ms. Shaw a desire to have visitation. Consequently, Mother had not participated in visitation for approximately a year and a half at the time of the hearing on the petition to terminate her parental rights. Ms. Shaw reiterated that Mother's mental health was a primary concern and addressing that concern was the most important aspect of the permanency plan. Although the initial permanency plan was revised, Ms. Shaw testified that Mother's tasks and expectations never materially changed.

Regarding the ground of persistent conditions, Ms. Shaw testified that Mother's residential stability and mental health were conditions that would prevent Cyric's return to Mother's home. Ms. Shaw explained that residential stability and mental health were separate concerns, and even if Mother properly addressed her mental health, Ms. Shaw still did not feel that Mother would be able to appropriately parent Cyric. Ms. Shaw explained her reasoning as follows:

> There's been a long history with [Mother], and she does not have that parent-child relationship . . . . And Cyric lacks the attachment between [M]other — between his mom. It's nonexistent. So . . . for [DCS], she would just need to be nurturing and be able to be physically present for his emotions and social development, and she has proven that she has not been able to do that.

Regardless, Ms. Shaw testified Mother failed to properly address her mental health during the pendency of this case. Thus, given the lack of progress, Ms. Shaw testified that she did not have any confidence in Mother's ability to appropriately address her mental health. Additionally, Ms. Shaw testified that she was concerned about the length of separation between Mother and Cyric, as well as the reoccurrence of food deprivation as a source of possible punishment. Ms. Shaw testified that she was not confident that Cyric would not be subjected to further abuse if he was returned to Mother. Ms. Shaw testified that she did not know whether Mother possessed the financial ability to provide for Cyric at that point, and that she did not know what Mother's source of income was since the death of her late uncle. Despite the opportunity, Ms. Shaw explained that Mother failed to engage and understand the problems and concerns that led to Cyric being placed into foster care. Moreover, Ms. Shaw explained that Mother denied many of the concerns that DCS expressed to her. Mother's continued denial of these issues concerned Ms. Shaw that the issues in need of addressing were not going to change. Ms. Shaw testified that she had difficulty communicating with Mother, she did not feel like there was any progress since Cyric entered custody, and Dr. Kay's description of Mother's persecutory behavior was consistent with the experience Ms. Shaw had with Mother. Ms. Shaw explained that this persecutory behavior hindered progress on the permanency plan.

Ms. Shaw addressed some of the best interest factors in her testimony. Ms. Shaw testified that: (1) Mother did not make lasting changes in her lifestyle or conduct that would make it safe for Cyric to go home; (2) Mother did not have regular visitation with Cyric; (3) DCS was prepared to help Mother accomplish what needed to be done in order to have visitation; (4) Mother and Cyric did not have a meaningful parent-child relationship, but rather, an unhealthy relationship; (5) returning Cyric to Mother's home would affect him drastically, especially due to his mental health issues; (6) Cyric was diagnosed with PTSD but had made improvements with that issue since he entered into DCS custody; (7) Mother abused and neglected Cyric; (8) Mother's mental and emotional state would be detrimental to Cyric because Mother would not be able to handle the mental health needs of Cyric and herself; and (9) Mother failed to pay her child support consistently, which was court-ordered. Ms. Shaw testified that Mother did not have a healthy relationship with Cyric, nor did she demonstrate that she cared how her child was doing or wanted to help her child become better. She explained that Cyric is not the child that he was when he came into DCS custody, and that he has made a lot of progress. Ms. Shaw concluded that it was not in the best interests of Cyric to be returned to Mother.

Mother testified about her income and her child support payments. She stated that she had a background in the field of caregiving, hospice, and assisting individuals in need of in-home care, and she had worked in that field for more than fifteen years. Mother explained that her income came from working for her aunt as a caregiver for Mother's uncle, and she had cared for him for around twelve to thirteen years. Mother testified that she was making approximately $1,400 every other week before her uncle passed away in

July 2020, which was also what the juvenile court found in its dispositional order in August 2019. However, Mother testified that the employment agreement between her and her aunt had changed, and she had not been paid since the death of her uncle. Mother admitted that her aunt still allowed her to live in the home rent-free. Mother testified that she attempted to find another job, but it was difficult for her. Mother explained that her only experience was in the healthcare field. However, she was no longer allowed to work in that field because the allegations of severe child abuse as to Castiel in 2014 were determined to be substantiated.[6] Mother also explained that the unpredictability of her schedule with meetings and court dates in this case made it difficult for her to find another job that would work with her schedule. Moreover, Mother explained that the COVID-19 pandemic had become a barrier to employment.

Mother admitted that there were some months that she did not pay child support. Mother explained why she did not make child support payments for some months:

Like I said, with the — the working for my uncle, it was kind of an ever-evolving situation as far as, you know, getting paid. . . . [T]here were also a lot of other expenses as far as with legal fees and things like that, so other bills that you have to pay and, you know — but I'm not trying to make an excuse, you know. . . . [S]ome months I would not have the money then, and then other months, I would try to make up for it.

In addition to a child support payment in the amount of $380.00 that she made at the time of the hearing in February 2021, Mother made three child support payments. Mother made child support payments in the amounts of $216.66 in June 2020, $300.00 in November 2020, and $300.00 in December 2020. Mother admitted that her child support for all three of her children was not a regular monthly expense that came out of her budget. Aside from her child support obligation, Mother explained that her monthly expenses generally included legal fees, a $60 phone payment, a $500 car payment, a $241 insurance payment, $400 in groceries, $200 to $300 in gas, and $140 for animal food. Mother also admitted that she was a smoker and bought a $5 pack of cigarettes every other day, which would add up to approximately $75 per month.

As previously noted, after Cyric was removed from Mother's custody in July 2019, DCS had developed a permanency plan that required Mother to submit to drug screens. At the outset, Mother resisted this requirement by refusing to complete and sign a drug screen form. Mother continued to resist this requirement by failing to complete any drug screens from August 2019 to March 2020 despite the juvenile court ordering her to do so. Mother failed to report for or submit to a total of fourteen drug screens during this time period. Mother testified that she felt more comfortable having someone other than DCS administer

---

[6] Mother was substantiated in 2014 in DCS's system for child abuse and neglect as to Castiel. When he was born, Castiel's umbilical cord results showed that he tested positive for Xanax and Tramadol.

- 17 -

her drug screens, which led to the juvenile court allowing her to report to the detention center. Mother continued to fail to report for or submit to multiple requests for drug screens after she was offered this alternative. In her testimony, Mother consistently responded with "I don't recall" to the question of whether she remembered these dates that DCS requested drug screens. However, Mother reported for drug screens in March 2020 and July 2020, and Mother also completed a hair follicle drug screen in June 2020. The hair follicle drug screen was approved in April 2020, but Mother delayed completion of the test until June 2020, despite Ms. Shaw's and the court's considerable efforts to encourage Mother to complete the hair follicle drug screen sooner. Mother's results for these drug screens came back negative.

Regarding the parenting assessment and the parenting education, Mother testified that she completed her full eight hours of required parenting education. Mother disagreed with Ms. Franks's and Ms. Shaw's characterization of her behavior and demeanor during visits with Castiel when she still had custody of Tristan and Cyric. Mother testified that she loved all of her children, it was a very hard situation, and she wasn't allowed to explain to Tristan and Cyric where Castiel had gone. Mother explained her interactions with her children as follows:

> [E]ven though we're here about Cyric right now, it is about all of them together. So it was probably one of the hardest things I've ever had to do, because it was twice a week. . . . Cyric would try to pick his brother up and put him in his car seat, and every time . . . Cas would say, Mom, why can't I get in my seat, and Cyric would get very, very upset. And [Tristan] was a little bit older, so he would try to hold it together for me.
>
> So every week, twice a week, for more than a year that's what our lives were like. And it was horrible, because it's my job as a parent, it doesn't matter how it makes me feel or how angry or sad or frustrated that I am, they get to be upset, I don't. They get to be upset in how they're feeling, and it is my job as a parent to completely hold it down and not react emotionally or — I think there was maybe like one or two times . . . I broke down in front of them. And that's me, I think, in my mind of me not doing my job as a parent, because it upset them so badly. Like, they were so upset for a long time after that, because they're not used to necessarily me breaking down like that.

Mother also explained that she felt her main goal during visitation was to have the three children spend time bonding together and interacting with each other. Mother testified that the reason she was late for some visits at the DCS office probably had to do with timing with getting the children ready. Mother testified that the times she left early were the times she was emotionally overwhelmed, and she felt like stepping away from the situation was the more adult thing to do so she did not get angry and frustrated in front of her children. Mother testified that she tried very hard not to say anything if she didn't have something

nice to say. Mother added that she did not want an argument and did not want to fight with anyone; when she was upset, she felt like removing herself from the situation was her last resort. However, the juvenile court's adjudicatory order stated that during one of the visits Mother did not permit Tristan and Cyric to come out and play with Castiel, and Mother did not permit Castiel to go into the home and talk to Tristan and Cyric. Mother denied that that was what happened at that visit. Mother explained that Tristan was completing schoolwork and Cyric was taking a nap at the time, so they were not available to interact with Castiel. During another visit, the former DCS case manager, Ms. Tanacha Griffin, noted that Mother told Tristan and Cyric not to get too close to Castiel and not to share toys with him. It was also noted that Mother arrived late and then left early by storming out of the room without showing Castiel any affection. As Mother was leaving, Castiel was yelling that he did not get a chance to hug and kiss Mother. At another visit, Mother was reported to appear "lethargic."

Mother testified about her psychological evaluation and its recommendations. Mother had not seen Cyric since he entered DCS custody in July 2019, and Mother understood that she needed to complete her psychological evaluation and follow its recommendations before she could participate in visitation with Cyric. As a first step, Mother completed her psychological evaluation with Dr. Kay in March 2020. After the psychological evaluation, Dr. Kay recommended that Mother participate in individual therapy and complete a medication evaluation. Mother testified that she completed a medication evaluation with Life Care[7] in August 2020, in which the doctor did not recommend any medication for her. However, Mother did not sign a release in order for DCS to obtain the information from the evaluation and to verify her compliance. In regard to the individual therapy, Mother testified that she had seen three different therapists in the past. The first two therapists were with Life Care, but Mother only spoke with them for an intake. The third therapist was private, and Mother testified that she completed a couple of sessions with her. However, Mother clarified that the therapy sessions occurred before the psychological evaluation in March 2020, and thus, before Dr. Kay's recommendation that Mother participate in individual therapy. Mother admitted that she understood the importance of complying with the recommendations, specifically the individual therapy, in order for her to be able to visit Cyric. She also admitted she was reminded of these tasks in CFTMs and it was "clear" to her that she needed to find a therapist.

Mother testified about Ms. Shaw's home visit and provided her side of the story. Mother explained that she was in the process of administering hospice care for her uncle. Mother explained that her uncle had progressed to the point where he could not be left alone for more than an hour, and she was helping to provide end of life care at that point. Mother described the time as being really intense, and her uncle required a great amount of care. Mother testified that when Ms. Shaw arrived, Mother communicated to Ms. Shaw

---

[7] Mother explained that Omni bought out Life Care, and she used those names interchangeably in her testimony.

that it was not a good time because of sickness in the home, COVID-19 risks, and the situation with her uncle near death. Mother also testified that she made it a point to not raise her voice or yell. Mother explained that she denied Ms. Shaw entry for a home visit because of everything that was going on at the time. Mother also explained why, according to Ms. Shaw's testimony, the home smelled of animal feces and urine:

> [M]y aunt has a little dog who's rescued. You know, she's an older, rescued dog so she has [had] some health problems towards the end of her life, so we do have those potty pads put down. We encourage not going in carpeted areas, and so we put them down on the hardwood in the foyer so [the dog] kind of knows that's her place, and they're changed, you know, every day. Overnight, they may accrue a little bit of [dog feces] and a little bit of [dog urine], but other than that, if you're to walk through the rest of the house, that's pretty much the designated area. It's not a lack of care; it's an animal that's in a bad situation that's been rescued.

Mother also testified that she never once implied in any way that anyone killed her uncle because of the visit. At this point, Mother was asked to read aloud the email she sent following the visit and the death of her uncle:

> It seems again the caseworker's inappropriate behavior once again is inflicted on everyone else. As you arrived on the doorstep of my home on Monday, without speaking to anybody in the home to confirm that it was an appropriate time for a home visit and after being told this was not a good time several times, then you basically forcefully tried to intimidate the homeowner after being told that there was illness in the home and as there are two high-risk individuals in the home that were already ill. The workers then insisted that the judge told them they could come in now, today, with no regard for the pandemic or personal health and safety.
>
> I insisted that they leave and the homeowner agreed. The inappropriate behavior floored everyone in the house as well as caused undue stress and a disruption. Sadly, that very night, my uncle and husband of my aunt passed away in the home with respiratory-related symptoms. We all in the home have been devasted by this loss. We are trying to find the best way to cope and come together as a family through this loss.

Although Ms. Shaw had emailed Mother about the home visit prior to her arrival, Mother testified that she was "unaware" that Ms. Shaw would be visiting. However, when asked about Ms. Shaw's emails, Mother testified that she did not respond because she was in the middle of taking care of her dying uncle at the time.

When asked about issues with Cyric, Mother denied that he had any issues with his

speech, and was surprised to learn that his speech evaluation put him below the first percentile for speech. Mother recalled receiving a letter from Cyric's foster parents with details about some of the challenges he was facing. Mother testified that she was always concerned about Cyric and his well-being. However, Mother admitted she had not seen Cyric since "the day he walked out [her] front door" in July 2019.

Mother testified about what progress she believed she had made toward meeting the goals asked of her. Mother testified that she felt she had made progress, and that she had spoken openly and honestly in her evaluations, parenting assessment, and parenting education about what she could do better as a parent. However, Mother admitted that she felt like she made a mistake in her progression and how she handled her therapy situation. Mother testified that she now understood what was being asked of her, and she would do things differently. Mother also testified about her understanding of what tasks she was supposed to complete:

> My understanding from the very beginning from my last day of court when Cyric left was, there was no contact at all whatsoever and all these assessments and everything had to be done and, you know, all those things from the parenting plan had to be done, and even then, that didn't mean that I was going to get to see Cyric.

Mother admitted that she could have done better and was not as successful as she could have been, but she felt like she was trying to meet the tasks that were being asked of her. Mother concluded that, if she was given more time, she would complete all of the tasks required of her now that she understood exactly what needed to be done.

On March 22, 2021, the juvenile court entered a forty-seven-page order terminating the parental rights of Mother. In its order, the juvenile court noted that Mother appeared the first day of trial completely disheveled with her hair all over her face, and she was shaking and rocking back and forth in her chair. The juvenile court's ultimate holding was as follows:

> The Court finds [DCS] has proven by clear and convincing evidence that grounds for termination of parental rights exist as to [Mother] pursuant to T.C.A. 36-1-113(g)(1) and 36-1-102 Abandonment by Failure to Support; T.C.A. 36-1-113(g)(1) and 36-1-102(1)(A) Failure to Provide a Suitable Home; T.C.A. 36-1[-]113(g)(2) and 37-2-403(a)(2) Substantial Noncompliance with Permanency Plan; T.C.A. 36-1-113(g)(3) Persistent Conditions; and T.C.A. 36-1-113(g)(8) Mental Incompetence.
>
> Further, [DCS] has proven by clear and convincing evidence that it is in the best interest of the child that all the parental rights of [Mother] to the child be forever terminated; and, therefore, the complete custody, control and

guardianship of the child be awarded to [DCS], with the right to place the child for adoption and to consent to the adoption in *loco parentis*.

On April 20, 2021, Mother timely filed this appeal.

## II.    ISSUES PRESENTED

Mother presents the following issues for review on appeal, which we have slightly restated:

1. Whether the juvenile court erred in finding that DCS had proven by clear and convincing evidence the ground of abandonment by failure to support;
2. Whether the juvenile court erred in finding that DCS had proven by clear and convincing evidence the ground of failure to provide a suitable home;
3. Whether the juvenile court erred in finding that DCS had proven by clear and convincing evidence the ground of substantial noncompliance with a permanency plan;
4. Whether the juvenile court erred in finding that DCS had proven by clear and convincing evidence the ground of persistent conditions;
5. Whether the juvenile court erred in finding that DCS had proven by clear and convincing evidence the ground of mental incompetence; and
6. Whether the juvenile court erred in finding that DCS had proven by clear and convincing evidence that termination of Mother's parental rights was in the child's best interests.

For the following reasons, we reverse the trial court in part and affirm in part.

## III.    STANDARDS APPLICABLE TO TERMINATION CASES

"A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016) (citations omitted). "No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Kaliyah S.*, 455 S.W.3d 533, 556 (Tenn. 2015) (citations omitted). Although parental rights are fundamental and constitutionally protected, parental rights are not absolute. *In re Carrington H.*, 483 S.W.3d at 522 (citation omitted).

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d at 546. Pursuant to this statute, a petitioner seeking termination of parental rights must prove two elements by clear and convincing evidence. *Id.* at 552. First, the petitioner must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee

Code Annotated § 36-1-113(g).  *Id.*  The grounds are "cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground."  Tenn. Code Ann. § 36-1-113(g).  Second, the petitioner must prove that termination of parental rights is in the best interests of the child, considering the best interest factors in Tennessee Code Annotated § 36-1-113(i).  *In re Kaliyah S.*, 455 S.W.3d at 552.  Because of the constitutional dimension of the parent's rights at stake, the party seeking termination "must prove all the elements of their case by clear and convincing evidence."  *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted).  "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings."  *Id.* (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 446 (Tenn. Ct. App. 2008)).

Due to this heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal.  *In re Audrey S.*, 182 S.W.3d at 861.  Appellate courts review the trial court's findings de novo in accordance with Tennessee Rule of Appellate Procedure 13(d), presuming each factual finding to be correct unless the evidence preponderates otherwise.  *In re Carrington H.*, 483 S.W.3d at 524.  Then, we make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights."  *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97).  "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness."  *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV.  DISCUSSION

### A.  Grounds for Termination Against Mother

We begin our analysis with whether the facts amount to clear and convincing evidence that at least one of the statutory grounds for parental termination exists.  The juvenile court found that DCS met its burden of proof on the following grounds: (1) abandonment by failure to support; (2) abandonment by failure to provide a suitable home; (3) substantial noncompliance with a permanency plan; (4) persistent conditions; and (5) mental incompetence.  We review the juvenile court's findings as to each ground for termination.

### 1.  Abandonment by Failure to Support

One ground for termination of parental rights exists if abandonment by the parent

has occurred. Tenn. Code Ann. § 36-1-113(g)(1). Under Tennessee Code Annotated section 36-1-102(1)(A), there are several alternative definitions of "abandonment." *See* Tenn. Code Ann. § 36-1-102(1)(A). One definition of abandonment is summarized as the failure to support. Tenn. Code Ann. § 36-1-102(1)(A)(i). Tennessee Code Annotated section 36-1-102(1)(A) defines abandonment for this ground as the following:

> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents . . . of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents . . . either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i). Additionally, "failed to support" or "failed to make reasonable payments toward such child's support" is defined as "failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). "For purposes of this subdivision (1), 'token support' means that the support, under the circumstances of the individual case, is insignificant given the parent's means[.]" Tenn. Code Ann. § 36-1-102(1)(B).

On July 27, 2020, DCS filed its petition to terminate the parental rights of Mother. The relevant four-month period immediately preceding the filing of the petition was from March 27, 2020, to July 26, 2020. *See In re Jacob C. H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (explaining the calculation of the four-month period). In November 2019, Mother had been ordered to pay retroactive child support in the amount of $1,016.00 to be paid at $25.00 per month, and her payment of current child support was set at $259.00 per month. In December 2020, during the pendency of this case, the juvenile court found Mother in contempt for nonpayment of child support. In addition to a child support payment in the amount of $380.00 that she made at the time of the hearing in February 2021, Mother made only three other child support payments: $216.66 in June 2020, $300.00 in November 2020, and $300.00 in December 2020. Mother testified that she was making approximately $1,400 every other week before her uncle passed away in July 2020, which was consistent with the amount found by the juvenile court in its dispositional order in August 2019. However, Mother testified that the employment agreement between her and her aunt had changed and that she had not been paid since the death of her uncle. Mother admitted that her aunt allowed her to live in the home for free, which meant that Mother did not have any housing expense.

In her testimony, Ms. Shaw testified that Mother was aware of the consequences of not paying child support because they were explained to her by the juvenile court. Mother admitted that there were some months that she did not pay child support and that her child support for her children was not a regular monthly expense that came out of her budget.

Mother explained why she did not make child support payments for some months:

> Like I said, with the — the working for my uncle, it was kind of an ever-evolving situation as far as, you know, getting paid. . . . [T]here were also a lot of other expenses as far as with legal fees and things like that, so other bills that you have to pay and, you know — but I'm not trying to make an excuse, you know. . . . [S]ome months I would not have the money then, and then other months, I would try to make up for it.

Mother was first ordered to pay child support in November 2019. She made only one child support payment in June 2020 before the petition to terminate her parental rights was filed in July 2020. Although Mother testified that she was not being paid after the death of her uncle in July 2020, Mother was employed and being paid during the relevant four-month period preceding the filing of the petition.

At the termination hearing and in her brief on appeal, Mother contended that her failure to pay was not a willful failure to pay during the time she was seeking employment. "The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure" and the parent bears "the burden of proof that the failure to visit or support was not willful." Tenn. Code Ann. § 36-1-102(1)(I). Mother's contention misses the mark because she was employed during the relevant four-month period that we must consider. According to Ms. Shaw, Mother was not incarcerated or incapacitated during the relevant four-month period preceding the filing of the petition to terminate her parental rights. Thus, we conclude that Mother failed to prove that her failure to support was not willful.

The juvenile court found that the one payment during the four-month period was token support based on Mother's means and ability. We also determine that this one payment of $216.66 was mere "token support" given Mother's means. Tenn. Code Ann. § 36-1-102(1)(B). Mother did not have to pay rent to live in her aunt's home, and Mother was employed and making $1,488 every other week during the four-month period preceding the filing of the petition. Moreover, Mother admitted that she spent about $75 in cigarettes per month and $140 per month for pet food, and yet failed to budget support for her child as a regular monthly expense. Given the fact that Mother should have received approximately $12,000 in income during this four-month period, Mother's one payment of $216.66 in June 2020 was mere "token support."

Therefore, we find that Mother failed to support her child. As such, we affirm the juvenile court's finding that DCS met its burden of proof on the ground of abandonment by failure to support.

### 2. Abandonment by Failure to Provide a Suitable Home

An alternative definition of abandonment is summarized as the failure to provide a

suitable home. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c). Tennessee Code Annotated section 36-1-102(1)(A) defines abandonment for this ground as the following:

> (ii)(a) The child has been removed from the home or the physical or legal custody of a parent or parents . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;
> (b) The juvenile court found . . . that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
> (c) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents . . . to establish a suitable home for the child, but that the parent or parents . . . have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent . . . in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent . . . toward the same goal, when the parent . . . is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii). DCS must make "reasonable efforts" by utilizing its superior resources to help the parent find a suitable home. *In re Rahjada W.*, No. E2019-01798-COA-R3-PT, 2020 WL 2893434, at *5 (Tenn. Ct. App. June 3, 2020). To establish abandonment by failure to provide a suitable home, DCS must make these "reasonable efforts" during a four-month period following the removal of the child. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c); *In re Rahjada W.*, 2020 WL 2893434, at *5. DCS's "efforts are deemed reasonable under the statute if its efforts 'equal or exceed the efforts of the parent . . . toward the same goal.'" *In re Dominic B.*, No. E2020-01102-COA-R3-PT, 2021 WL 774185, at *6 (Tenn. Ct. App. March 1, 2021) (quoting Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c)). We note that "the establishment of a suitable home entails considerations as to whether '[a]ppropriate care and attention' are given to the child at issue." *Id.* (quoting *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016)). Furthermore, "the proof necessary to support termination under this ground need not be limited to any particular four-month period after removal. As long as the proof relates to 'a period of four (4) months following the removal, . . . the ground may be established.'" *In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Dec. 15, 2016) (quoting Tenn. Code Ann. § 36-1-102(1)(A)(ii)). Thus, our inquiry is not limited "to a period of four months *immediately* following the [child's] removal." *Id.*

In June 2019, the juvenile court entered an adjudicatory order declaring the three children to be dependent and neglected, which was then amended in July 2019. The juvenile court found that DCS provided numerous efforts to assist Mother prior to removing the child, those having occurred during the time that DCS had a non-custodial case regarding the children from October 2017 until July 2019. The juvenile court explained that DCS made reasonable efforts to assist Mother with staffing a CFTM to develop a permanency plan identifying the issues that brought the child into custody; reviewing the tasks of the permanency plan with Mother; and obtaining funding for the psychological evaluation, the parenting assessment and education, and the drug screens and hair follicle test. Despite the reasonable efforts of DCS, the juvenile court found that Mother blatantly disrespected its court orders, denied visitations, and was difficult and disobedient. The juvenile court found that the facts of the case supported a finding of dependency and neglect pursuant to Tennessee Code Annotated sections 37-1-102(b)(13)(B), (C), and (G). Cyric was removed from Mother's home and entered DCS custody in July 2019.

After Cyric entered DCS custody, Mother was difficult to communicate with, consistently failed to report or submit to drug screens, and refused to sign releases of information for her evaluations. Between August 2019 and March 2020, Mother failed to report for or submit to a total of fourteen drug screens. The hair follicle drug screen was approved in April 2020, but Mother delayed the test until June 2020, despite Ms. Shaw's and the court's considerable efforts to encourage Mother to complete the hair follicle drug screen sooner. After DCS obtained funding for Mother's psychological evaluation in October 2019, Mother delayed its completion until March 2020. Mother also delayed completing the evaluation's recommendations, which prevented Mother from participating in visitation with Cyric. Mother admitted that she understood the importance of complying with the recommendations, specifically the individual therapy, in order for her to be able to visit Cyric. She also admitted she was reminded of these tasks in CFTMs and it was "clear" to her that she needed to find a therapist. Mother completed her parenting assessment in September 2019 and her parenting education in October 2019, but Mother delayed completing the recommended additional parenting education until August 2020. Mother delayed its completion despite Ms. Shaw obtaining funding for the parenting education classes every month from January 2020 until August 2020. Ms. Shaw testified that addressing Mother's mental health was a primary concern, and Mother's lack of concern in addressing this issue demonstrated a lack of concern for her child. Despite the reasonable efforts made by DCS to help Mother get on track, Mother delayed or disregarded the completion of the tasks required to address her mental health and establish a suitable home for Cyric. As such, without having addressed her mental health, failing to comply with drug screens, and failing to show more concern for her child, it appears unlikely that Mother will be able to provide a suitable home for Cyric in the near future. Like the juvenile court held, though Mother has four walls and roof over her head, she does not have a suitable home that would provide for the safe well-being of Cyric.

- 27 -

We find that DCS made reasonable efforts to assist Mother both prior to and following the removal of Cyric. Conversely, Mother was difficult, delayed much of her progress, and did not make efforts exceeding those of DCS. Therefore, we affirm the juvenile court's finding that DCS met its burden of proof on the ground of abandonment by failure to provide a suitable home.

### 3. Substantial Noncompliance with a Permanency Plan

Another ground for termination exists based on a parent's substantial noncompliance with the statement of responsibilities in a permanency plan. Tenn. Code Ann. § 36-1-113(g)(2). To terminate a parent's parental rights under this ground, the parent's noncompliance with the plan must be substantial and the plan's requirements must be "reasonable and related to remedying the conditions which necessitate[d] foster care placement." *In re Valentine*, 79 S.W.3d at 547. "In the context of the requirements of the permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *Id*. at 548. Determining whether a parent has sufficiently complied with a permanency plan "involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed[.]" *In re Carrington H.*, 483 S.W.3d at 537.

After DCS developed a permanency plan for Mother, the juvenile court entered an order ratifying the plan on November 1, 2019. Mother's responsibilities are summarized again as follows:

1. Complete a psychological evaluation and follow reasonable recommendations of the evaluation;
2. Submit to a hair follicle drug test;
3. Submit to random drug screens twice per month;
4. Complete parenting education provided by DCS to address age appropriate discipline, age appropriate parenting techniques, understanding Cyric's mental, emotional, and physical health needs, and issues recommended by the parenting assessment or psychological evaluation;
5. Complete a parenting assessment and follow reasonable recommendations of the assessment;
6. Demonstrate age appropriate discipline and understanding of age appropriate parenting techniques;
7. Display an understanding of all of Cyric's mental, emotional, and physical health needs and an understanding of the importance of appointments;
8. Be free of any criminal activity and not incur any additional charges;
9. Resolve all current and pending legal issues and follow all valid court orders;
10. Attend and participate in all CFTMs, court hearings, and foster care review boards, and continue to communicate with DCS and other team members;

11. Allow DCS and CASA to conduct a walkthrough of her home prior to the start of any trial home visit to ensure that it is appropriate for Cyric to return, and comply with the home study process;

12. Ensure that anyone residing in her home over the age of 18 will be able to pass a background check to ensure that Cyric is appropriately cared for and supervised;

13. Disallow illegal activity in her home;

14. Obtain and maintain appropriate housing with adequate size and furnishing for the family, and be able to provide a copy of the lease to DCS for verification;

15. Ensure that her home has plumbing and access to clean running water and utilities, meets fire hazard prevention standards, and meets minimal housing keeping standards;

16. Comply with the plan and notify DCS or the service provider in a timely manner if she is unable to visit, arrive on time to visits, and contact DCS and the Omni visitation supervisor between twenty-four and forty-eight hours prior to scheduled visits to confirm whether or not she plans to attend the visit;

17. Interact and engage with Cyric in appropriate activities during visits and promote a positive environment during visits; and

18. Participate in supervised visitation at a minimum of four hours per month, and contact DCS and the Omni visitation supervisor between twenty-four and forty-eight hours prior to scheduled visits to confirm whether or not she plans to attend the visit.

Throughout this case, the plan was revised, but Mother's tasks never materially changed. We determine that these requirements were "reasonable and related to remedying the conditions which necessitate[d] foster care placement." *In re Valentine*, 79 S.W.3d at 547.

Regarding her noncompliance, Mother failed to submit to random drug screens twice a month, failed to be free of any criminal activity and avoid accruing additional charges, and failed to participate in visitation. Because she failed to participate in visitation, Mother was unable to interact and engage with Cyric after he was removed from her custody. Mother consistently disobeyed court orders for her to submit to drug screens and to pay her child support. Mother also did not allow DCS to conduct a walkthrough of her home. Because DCS was unable to complete a walkthrough of Mother's home, DCS was unable to verify if the home was appropriate, if the home was free of illegal activity, and if the home met required standards. Moreover, Ms. Shaw testified that Mother was difficult to communicate with and it was typical for Mother to complete tasks required of her just before going to court. Mother did not provide DCS with a copy of a lease for verification; however, we do not hold this specific fact against Mother because of the informal arrangement she had with her aunt.

Although Mother was late for CFTMs, Ms. Shaw testified that Mother complied with attendance and participation as required. Mother completed her parenting assessment in September 2019 and her parenting education in October 2019 and August 2020. She

completed her psychological evaluation in March 2020 and her hair follicle drug screen in June 2020. After the psychological evaluation, Dr. Kay recommended that Mother participate in individual therapy and complete a medication evaluation. Mother testified that she completed a medication evaluation with Life Care in August 2020, and that the doctor did not recommend any medication for her. However, Mother did not sign a release in order for DCS to obtain the information from the evaluation and to verify her compliance. In regard to the individual therapy, Mother testified that she had seen three different therapists. The first two therapists were with Life Care, but Mother only spoke with them for an intake. The third therapist was private, and Mother testified that she completed a couple of sessions with her. However, Mother clarified that the therapy sessions occurred before the psychological evaluation in March 2020, and thus, before Dr. Kay's recommendation that Mother participate in individual therapy. Therefore, Mother was not in compliance with this recommendation. Mother admitted that she understood the importance of complying with the recommendations, specifically the individual therapy, in order for her to be able to visit Cyric.

The juvenile court found that DCS made "patient, herculean efforts" to assist Mother, and yet, Mother was stuck in the same position she was in when DCS introduced themselves three and one-half years ago. Although Mother completed some of these tasks required of her, Mother delayed the completion of her psychological evaluation for more than seven months. Mental health was the primary concern and addressing that concern was the most important aspect of the permanency plan. In reviewing this ground, we are concerned "with [Mother]'s efforts to comply with the plan, not the achievement of the plan's desired outcomes." *In re Daniel B., Jr.*, No. E2019-01063-COA-R3-PT, 2020 WL 3955703, at *5 (Tenn. Ct. App. July 10, 2020) (citing *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009)). "'[O]utcome achievement is not the measure of compliance." *In re Mya V.*, No. M2016-02401-COA-R3-PT, 2017 WL 3209181, at *6 (Tenn. Ct. App. July 28, 2017) (quoting *In re B.D.*, 2009 WL 528922, at *8). However, Mother's efforts here were lacking, to say the least. Given that Mother was noncompliant with several of the tasks in her permanency plan, and uncooperative and delayed in completing what tasks she did complete, we conclude that Mother's noncompliance was substantial. Therefore, we affirm the juvenile court's finding that DCS met its burden of proof on the ground of substantial noncompliance with the permanency plan.

### 4. Persistent Conditions

The fourth ground for termination at issue on appeal is persistent conditions. This ground for termination applies when:

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the

- 30 -

juvenile court alleging that a child is a dependent and neglected child, and:
(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent of guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Tenn. Code Ann. § 36-1-113(g)(3). Each element must be proven by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550. We have stated that this ground applies "when, by court order, a 'child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months' as a result of a dependency and neglect petition." *In re Boston G.*, No. M2019-00393-COA-R3-PT, 2020 WL 2070399, at *6 (Tenn. Ct. App. Apr. 29, 2020); *see also In re D.V.*, No. E2018-01438-COA-R3-PT, 2019 WL 1058264, at *5 (Tenn. Ct. App. Mar. 6, 2019) ("The child must have been removed from the home or the physical or legal custody of a parent/guardian for a period of six (6) months by a court order entered following a petition alleging that the child is a dependent and neglected child.")

In June 2019, the juvenile court entered an adjudicatory order declaring Mother's three children to be dependent and neglected, which was then amended in July 2019. Accordingly, the juvenile court entered a protective custody order as to Cyric, and Cyric entered into DCS custody in July 2019. As such, Cyric had been removed from Mother's home for approximately one year before DCS filed its petition to terminate Mother's parental rights. Ms. Shaw testified that Mother's residential stability and mental health were conditions that would prevent Cyric's return to Mother's home. Ms. Shaw explained that Mother does not have a parent-child relationship with Cyric, Cyric's attachment to Mother is nonexistent, and Mother failed to prove that she was able to be nurturing and physically present for Cyric's emotions and social development.

Ms. Shaw testified that Mother failed to properly address her mental health during the pendency of this case. Given the lack of progress, Ms. Shaw testified that she did not have any confidence in Mother's ability to appropriately address her mental health. Additionally, Ms. Shaw testified that she was concerned about the length of separation between Mother and Cyric as well as the reoccurrence of food deprivation as a source of possible punishment. Ms. Shaw testified that she was not confident that Cyric would not

be subjected to further abuse if he was returned to Mother. Ms. Shaw testified that she did not know whether Mother possessed the financial ability to provide for Cyric at that point, and that she did not know what Mother's source of income was since the passing of her late uncle. Despite the opportunity, Ms. Shaw explained that Mother failed to engage and understand the problems and concerns that led to Cyric being placed into foster care. Moreover, Ms. Shaw explained that Mother denied many of the concerns that DCS expressed to her. Mother's continued denial of these issues concerned Ms. Shaw that the issues in need of addressing were not going to change. Ms. Shaw testified that she had difficulty communicating with Mother, she did not feel like there was any progress since Cyric entered custody, and Dr. Kay's description of Mother's persecutory behavior was consistent with the experience Ms. Shaw had with Mother. Ms. Shaw explained that Mother's persecutory behavior hindered progress on the permanency plan. Dr. Kay concluded in her report that Mother's lack of cooperation with DCS brought into question how much she really wants custody of Cyric and whether she would be willing or able to meet the needs of her son if she obtained custody. The juvenile court concluded that "Mother has not seen the child since July 2019 so there is basically no relationship now. This child deserves to be loved and hugged. Mother is not capable of that and has demonstrated no effort to change."

We find the conditions that led to the child's removal persist, preventing his safe return to Mother. As we have already discussed, Mother delayed the completion of her psychological evaluation for more than seven months. Mother's mental health was a contributing factor toward the stability of her home, the ability to parent her child, and the inability to exercise visitation with her child. Therefore, we find that Mother's lack of urgency in taking the steps necessary to address all of these conditions demonstrates little likelihood that these conditions will be remedied such that the child could be safely returned in the near future. Furthermore, Mother's failure to complete the psychological evaluation and its recommendations contributed to the separation between Mother and Cyric because she was not able to participate in visitation. Similar to Dr. Kay's concern, this Court is concerned with Mother's lack of motivation to achieve the stability necessary to take care of her child and meet his needs. For these reasons, we find that the continuation of the parent-child relationship would greatly diminish Cyric's chances of early integration into a safe, stable, and permanent home. Therefore, we affirm the juvenile court's finding that DCS met its burden of proof on the ground of persistent conditions.

### 5. Mental Incompetence

The final ground for termination at issue on appeal is mental incompetence. This ground for termination applies when:

> (8)(A) The chancery and circuit courts shall have jurisdiction in an adoption proceeding, and the chancery, circuit, and juvenile courts shall have jurisdiction in a separate, independent proceeding conducted prior to an

adoption proceeding to determine if the parent or guardian is *mentally incompetent* to provide for the further care and supervision of the child, and to terminate that parent's or guardian's rights to the child;

(B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:

(i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and

(ii) That termination of parental or guardian rights is in the best interest of the child;

(C) In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated[.]

Tenn. Code Ann. § 36-1-113(g)(8) (emphasis added). We have explained in prior cases that:

[t]he standard for this issue has been described as inquiring as to whether "by clear and convincing evidence [ ] the parent of the child is incompetent to adequately provide care and supervision because the parent's mental condition is so impaired and likely to remain so that it is unlikely that the parent will be able to assume care and responsibility for the child in the future." *State Dept. of Children's Services v. Whaley*, No. E2001-00765-COA-R3-CV, 2002 WL 1116430, at *14 (Tenn. Ct. App. May 30, 2002), *no appl. perm. appeal filed*. This Court has affirmed this ground, in one instance, where the parent "functioned in such a low range that no amount of training, education, or counseling 'could bring him up to the level where he could parent these children.'" *State, Dept. of Children's Services v. Mims*, 285 S.W.3d 435, 449 (Tenn. Ct. App. 2008).

*In re Jayda J.*, No. M2020-01309-COA-R3-PT, 2021 WL 3076770, at *6 (Tenn. Ct. App. July 21, 2021) (quoting *In re Lorenda B.*, No. M2016-01841-COA-R3-PT, 2017 WL 1416858, at *9 (Tenn. Ct. App. Apr. 19, 2017)). To meet the burden for this ground, DCS must "demonstrate two essential facts: (1) that Mother is *presently* unable to care for the subject children and (2) that Mother is *unlikely to be able to care for the children in the near future*." *In re David J.B.*, No. M2010-00236-COA-R3-PT, 2010 WL 2889265, at *7 (Tenn. Ct. App. July 23, 2010) (citing Tenn. Code Ann. § 36-1-113(g)(8) (2010) (emphasis added)).

In the psychological evaluation report, Dr. Kay described Mother as "hypervigilant," "persecutory," "moderately anxious," "obsessive," "manic," "hostile and

guarded," and "depressed." Dr. Kay's diagnostic impressions of Mother were listed as obsessive-compulsive personality disorder with schizoid features, major depression (recurrent, severe, without psychotic features), and generalized anxiety disorder. Dr. Kay testified that Mother scored high on the factor of having unrealistic or inappropriate expectations of her children. Dr. Kay explained that "that's a situation that can become volatile very easily if you have unrealistic expectations of what the child is able to do." As a result of the evaluation, Dr. Kay recommended individual therapy, an evaluation for medication management "if deemed necessary," parenting classes, and routine drug screens. At the hearing, Dr. Kay noted that the fact that Mother refused drug screens, would not allow the school to develop an individualized education plan (IEP) for Cyric, and would not allow Cyric to get medication for ADHD were "major red flags." At the same time, however, she could not say for certain that Mother's unwillingness to do things necessary for the IEP evaluation or to get ADHD medication would be "tied to her mental health issues." She explained that "there could be so many reasons why someone might . . . refuse to do something," such as her own lack of appropriate parenting as a child.

Dr. Kay was concerned about suspected drug use, and stated that a parent cannot parent if he or she is using drugs. Furthermore, Dr. Kay was concerned with the fact that Mother had still not completed all of her recommendations: "That would concern me as to how motivated she is to get herself stable enough to take care of her kids, on one hand, if she wanted to take care of them; and on the other hand, how invested she is in meeting the needs of her children." Despite her diagnostic impressions of Mother, Dr. Kay explained that people with these disorders are capable of properly parenting a child. Dr. Kay testified that there are plenty of people who are depressed and anxious that parent children, but "normally" it would help if they were in therapy or medicated. She added, "I didn't say [Mother] couldn't care for her children, but I did recommend therapy."

As we have previously thoroughly discussed, Mother delayed or disregarded much of Dr. Kay's recommendations throughout this case, as well as many other tasks required to address her mental health. Mother admitted that she understood the importance of complying with the recommendations, specifically the individual therapy, in order for her to be able to visit Cyric. Mother repeatedly failed to properly address her mental health, which was the primary concern and most important aspect of the permanency plan. As for Mother's condition at the time of trial, the juvenile court noted that Mother appeared the first day of trial completely disheveled with her hair all over her face, and she was shaking and rocking back and forth in her chair. Although Mother exhibited unwillingness to address her mental health issues throughout DCS's involvement with this family, Mother admitted that she felt like she made a mistake in her progression and how she handled her therapy situation, and she testified that she now understood what was being asked of her.

The juvenile court determined that while Mother indicated she was willing to seek out therapy, her past actions in the last several years offered no assurance that anything would change from this point going forward. Therefore, the juvenile court found that

Mother's parental rights should be terminated on this ground that she had made no progress to address her mental health. However, Dr. Kay opined that Mother could be capable of parenting her child if she sought individual therapy and an evaluation for medication management "if deemed necessary," attended parenting classes, and completed routine drug screens. In light of Dr. Kay's testimony, we determine that if Mother sought appropriate treatment, it is possible she would be able to assume care and responsibility in the near future, without considering her shortfalls in the other grounds for termination. Mother's mental health condition is something that she could overcome, although doing so requires her to take some initiative. Thus, we are not convinced that DCS met its high burden on this ground based on the proof presented. It appears that Mother's mental condition was *presently* impaired, but it did not rise to the level that it would be *unlikely* she would be able to assume or resume the care of and responsibility for her child in the near future. *See In re David J.B.*, 2010 WL 2889265, at *7 (citing Tenn. Code Ann. § 36-1-113(g)(8) (2010)). As Dr. Kay testified, there are plenty of people with disorders similar to Mother's disorders that parent children.[8] This testimony is similar to the testimony in a case where the experts opined that the parents "could learn to competently parent with intensive, long-term intervention." *In re Christopher S.*, No. E2012-02349-COA-R3-PT, 2013 WL 5436673, at *17 (Tenn. Ct. App. Sept. 27, 2013). In that case, we concluded that the evidence did not support the trial court's finding that the parents were mentally incompetent to provide for the further care and supervision of their children. *Id.* With appropriate treatment, it is likely that Mother's mental condition could improve to the point where she could assume care and responsibility for Cyric in the near future. *See In re Keisheal N.E.*, No. M2009-02527-COA-R3-PT, 2010 WL 2176104, at *7 (Tenn. Ct. App. May 28, 2010) ("[T]he expert testimony presented at trial, principally that of Dr. Monroe, established, without contradiction, that Father, with proper treatment and medication over a period of six months, may be appropriate for consideration as a placement option for his children."). Thus, given Dr. Kay's testimony, we hold that the record before us fails to provide clear and convincing evidence that Mother is incompetent to adequately provide for the child because her mental condition is presently so impaired and is so likely to remain so that it is unlikely that Mother will be able to assume care and responsibility for Cyric in the near future. Having found that DCS failed to prove the first two statutory elements of

---

[8] We note that we have rejected the argument that this ground is reserved only for parents who have a condition for which no amount of intervention can assist. *In re Lena G.*, No. E2016-00798-COA-R3-PT, 2017 WL 2304448, at *25 (Tenn. Ct. App. May 26, 2017). Instead, given the unique circumstances in some cases, we have affirmed the termination of parental rights for mental disorders of this type. *Id.* (citing *State, Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990) (affirming the termination of parental rights of a parent diagnosed with schizophrenic disorder on the basis of mental incompetence, although the acts of the mentally disabled parent were not willful); *In re S.M.R.*, No. M2008-01221-COA-R3-PT, 2008 WL 4949236, at *6 (Tenn. Ct. App. Nov. 18, 2008) (affirming a termination of parental rights on the statutory ground of mental incompetence when the parent was diagnosed with bipolar disorder and personality disorder, not otherwise specified); *Dep't of Children's Servs. v. M.R.N.*, No. M2006-01705-COA-R3-PT, 2007 WL 120038, at *10 (Tenn. Ct. App. Jan. 17, 2007) (affirming a termination of parental rights on the statutory ground of mental incompetence based on a diagnosis of adjustment disorder with anxiety and depressed mood, as well as dependent personality disorder)).

this ground, we do not reach the best interest element.  Therefore, we reverse the juvenile court's finding that DCS met its burden of proof on the ground of mental incompetence.

## B. Best Interests of the Child

We now review whether termination of Mother's parental rights was in the best interests of the child.[9]  This Court has explained that:

> The best interests of a child do not become a paramount consideration until the trial court has determined that the parent is unfit based on clear and convincing evidence of one or more of the grounds for termination listed in Tenn. Code Ann. § 36-1-113(g).  Once a parent has been found to be unfit, the interests of the parent and the child diverge.  While the parent's interests do not evaporate upon a finding of unfitness, *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599 (1982), the focus of the proceeding shifts to the best interests of the child.

*In re Audrey S.*, 182 S.W.3d at 877.  We "must consider nine statutory factors listed in Tennessee Code Annotated § 36-1-113(i)."  *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017).  Those nine statutory factors are listed as follows:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established

---

[9] Without providing any argument in her brief on appeal, counsel for Mother raises this issue and correctly states that "the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal."  *In re Carrington H.*, 483 S.W.3d 507, 525 (Tenn. 2016).  Mother's counsel did the same with respect to two of the grounds for termination.  However, we have previously observed, the practice employed by Mother's counsel "stretch[es] the supreme court's intention [in *In Re Carrington H.*] to its outer limit."  *In re Mya V.*, No. M2016-02401-COA-R3-PT, 2017 WL 3209181, at *3 (Tenn. Ct. App. July 28, 2017).  We have also previously "caution[ed] counsel against the use of our Supreme Court's holding in this manner."  *In re Edward R.*, No. M2019-01263-COA-R3-PT, 2020 WL 6538819, at *6 n.3 (Tenn. Ct. App. Nov. 6, 2020) (quoting *In re Yariel S.*, No. E2016-00937-COA-R3-PT, 2017 WL 65469, at *6 (Tenn. Ct. App. Jan. 6, 2017) (citing Tenn. Sup. Ct. R. 8, RPC 8(3) (providing that lawyers are obligated to act as a **zealous advocate** on behalf of his or her client)).  We do the same here. *See In re Artemas A.*, No. W2021-00058-COA-R3-PT, 2021 WL 4352540, at *8 n.7 (Tenn. Ct. App. Sept. 24, 2021).

between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878. We view the child's best interests from the child's perspective rather than the parent's perspective. *Id.* Finally, we "must consider all of the statutory factors, as well as any other relevant proof any party offers." *In re Gabriella D.*, 531 S.W.3d at 682. However, "a finding on each factor is not required." *In re Kaylene J.,* No. E2019-02122-COA-R3-PT, 2021 WL 2135954, at *18 (Tenn. Ct. App. May 26, 2021); *see In re Matthew T.*, 2016 WL 1621076, at *16 (citing *In re Dominique L.H.*, 393 S.W.3d 710, 719 (Tenn. Ct. App. 2012)).

The first statutory factor is whether Mother "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian[.]" Tenn. Code Ann. § 36-1-113(i)(1). Ms. Franks testified that she had seen no improvement in Mother at all and that things had actually gotten much worse. Ms. Franks explained that Mother did not care about the medical needs, the emotional needs, and the educational needs of any of the children; nor did she complete the tasks required of her to visit her children. In conclusion, Ms. Franks testified that she was concerned about Cyric potentially returning to Mother's care because of her emotional neglect, her educational neglect, and her suspected drug abuse. Ms. Franks explained that Mother had tested positive for drugs in the past and had missed many of drug screens she had been contacted to report for. Ms. Shaw testified that she did not feel like there was any progress since Cyric entered custody, and that Dr. Kay's description of Mother's persecutory behavior was consistent with the experience Ms. Shaw had with

Mother. Ms. Shaw explained that Mother's persecutory behavior hindered her progress on the permanency plan. Ms. Shaw also testified that Mother's distrust was a common theme from the very beginning of DCS's involvement and was a reason that Mother gave for why she did not want to cooperate with the various tasks required of her. Mother's distrust was to a degree that it prevented her from meeting Cyric's needs and was a concern for DCS. This concern was further demonstrated in Mother's refusal to consent to Cyric's ear surgery. Mother refused to consent to Cyric's surgery despite the fluid build-up behind his ears causing him to have hearing and speaking difficulties, daily headaches, severe congestion, and trouble breathing and sleeping. Mother also refused to engage with doctors about recommendations that Cyric be prescribed medications for ADHD.

Mother testified about what progress she believed she had made toward meeting the goals asked of her. Mother testified that she felt she had made progress, and she had spoken openly and honestly in her evaluations, parenting assessment, and parenting education about what she could do better as a parent. However, Mother admitted that she made a mistake in her progression and how she handled her therapy situation. Mother admitted that she could have done better and was not as successful as she could have been but claimed she was trying to meet the tasks that were asked of her. We note that it was especially concerning that during the pendency of this case, Mother failed to complete the tasks required of her, specifically those associated with addressing her mental health, in order to participate in visitation with Cyric. As such, Mother's condition remained practically the same as when Cyric was removed from Mother's custody in July 2019. Mother also consistently demonstrated conduct throughout this case that raised concerns about her ability to meet the needs of Cyric. Rather than adjust her behavior and circumstances for her child, Mother demonstrated distrustful and maladaptive behavior throughout this case. Thus, we find that this factor weighs in favor of termination.

The second statutory factor is whether Mother "has failed to effect a lasting adjustment after reasonable efforts by available social service agencies for such duration of time that lasting adjustment does not reasonably appear possible[.]" Tenn. Code Ann. § 36-1-113(i)(2). DCS became involved with this family in 2017, and since then, DCS made reasonable efforts to help Mother make an adjustment. From the beginning, Mother resisted DCS's efforts. Mother did not want to take drug screens with DCS, so the juvenile court offered Mother the alternative of reporting to the detention center for her drug screens. After this accommodation, Mother still failed to report for or submit to drugs screens. After DCS obtained funding for Mother's psychological evaluation in October 2019, Mother delayed its completion until March 2020. Mother delayed completion of the additional parenting education despite Ms. Shaw obtaining funding for it every month from January 2020 until August 2020. Ms. Shaw reminded Mother of the tasks that she needed to complete and notified Mother about the status of services that DCS was providing her. Ms. Shaw testified that Mother's communication was nonexistent aside from sporadic emails. Ms. Shaw explained that she would email Mother and would not receive a response until two or three days later. In her report from the psychological evaluation, Dr. Kay

concluded that Mother's lack of cooperation with DCS brought into question how much she really wants custody of Cyric and whether she would be willing or able to meet the needs of her son if she obtained custody. We find that this factor weighs in favor of termination.

The third statutory factor is whether Mother "has maintained regular visitation or other contact with the child[.]" Tenn. Code Ann. § 36-1-113(i)(3). After DCS obtained funding for Mother's psychological evaluation in October 2019, Mother delayed its completion until March 2020. Mother also delayed completing the evaluation's recommendations, which precluded Mother from participating in visitation with Cyric. Mother admitted that she understood the importance of complying with the recommendations, specifically the individual therapy, in order for her to be able to visit Cyric. She also admitted she was reminded of these tasks in CFTMs, and it was "clear" to her that she needed to find a therapist. Ms. Shaw testified that Mother had been unable to engage in any visitation because she did not follow the recommendations of the psychological evaluation. Ms. Shaw testified that Mother was aware of what she needed to do to be able to have visitation with Cyric, Mother never asked about having visitation with Cyric, and Mother did not express a desire to have visitation to Ms. Shaw. Consequently, Mother had not participated in visitation for approximately a year and a half at the time of the hearing on the petition to terminate her parental rights. According to Mother, she had not seen Cyric since July 2019. Therefore, we find that this factor weighs in favor of termination.

The fourth statutory factor is "[w]hether a meaningful relationship has otherwise been established between [Mother] and the child[.]" Tenn. Code Ann. § 36-1-113(i)(4). Ms. Shaw explained that Mother does not have a parent-child relationship with Cyric, Cyric's attachment to Mother is nonexistent, and Mother failed to prove that she was able to be nurturing and physically present for Cyric's emotions and social development. Ms. Shaw also testified that Mother did not have a healthy relationship with Cyric, nor did she demonstrate that she cared how her child was doing or wanted to help her child become better. Ms. Pavone testified that when she would ask questions about "mom," Cyric would ask "which mom?" which demonstrated that Cyric's default would not go to Mother being "mom." When asked if Cyric loves Mother, Ms. Pavone testified that although Cyric does talk about loving and missing her, Cyric's expressions sometimes appear to be the natural biological connection of a mother and son. Throughout this case, Mother was described as cold, unemotional, and inattentive toward her children. For these reasons, we find that this factor weighs in favor of termination.

The fifth statutory factor is "[t]he effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition[.]" Tenn. Code Ann. § 36-1-113(i)(5). Cyric received individual therapy during this case, and because of that therapy, he has made progress with identifying his emotions, and has improved because of his interactions with his brothers. Ms. Pavone testified that

Cyric was initially off-putting, detached, and very black and white about missing his Mother, but now has improved and expressed more emotion since therapy began. Ms. Shaw testified that Cyric was diagnosed with PTSD and has had struggles with his mental health, but Cyric has made improvements. She explained that Cyric is not the child that he was when he came into DCS custody, and that he has made a lot of progress. Once Cyric entered into foster care, Ms. Franks explained that he was a different child; opened up; was very friendly, happy, and talkative; and would answer any question asked of him. Furthermore, Ms. Franks testified that doctors recommended surgery to improve his hearing while he was in foster care, but DCS had to obtain a court order approving the surgery because Mother refused to consent to it. Since then, Ms. Franks testified that his speech improved, "he is a normal, happy eight-year-old now," and "I can understand every word he says." Ms. Franks explained Cyric's progression in foster care as follows: "He's doing very well. He's in school now. He loves school. He loves his teacher. Turned out he's an above-average child, doing very well in . . . every class. Very respectful. Respectful at home, respectful at school. He has lots of friends. He's doing just great." Cyric's condition improved while in foster care, and it is likely that returning him to his Mother's care would have a detrimental effect on his emotional, psychological, and medical condition. Therefore, we find that this factor weighs in favor of termination.

The sixth statutory factor is "[w]hether the parent [ ], or other person residing with the parent [ ], has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household[.]" Tenn. Code Ann. § 36-1-113(i)(6). Cyric stated that Mother became unaffectionate toward him once he was in his room all the time and was not allowed to leave. Cyric described a lock being on the outside of his door that was too high for him to reach. He also described being stuck in his crib with the mesh-like net over it and how he attempted to open the zipper so he could escape. As for his saddest memory, Ms. Pavone explained that Cyric remembered a particular time where Mother was especially mad at him and locked him in his room for two days with only a training potty to use for the restroom. Ms. Pavone also testified that she discussed with Cyric what punishment and consequences looked like from his perspective:

> [H]e said that his consequences were that he would be told he couldn't eat. So if you don't do X, you won't get to eat for the rest of the day or he would get spankings. And he said spankings, it was never with anything other than a hand, so no belt or other tools were used. . . . [W]hen he would get spanked . . . he couldn't identify the exact number, but it wouldn't be two or three swats. It would be, you know, more like six, seven, or up. And he said that [Mother] would be very angry. And I asked him where on his body he had been spanked, and he identified his legs, his bottom, his back, and his arms. And he just said it's just . . . wherever she wanted to that day, like whatever she wanted.

This alarming conduct by Mother subjected Cyric to abuse and neglect. Moreover, DCS became involved with this family after an incident where Mother inadvertently set Castiel on a hot ceramic cooktop. Prior to that incident, Mother was substantiated in 2014 in DCS's system for child abuse and neglect as to Castiel. After his birth, Castiel's umbilical cord results showed that he tested positive for Xanax and Tramadol. Therefore, we find that this factor weighs in favor of termination.

The seventh statutory factor is "[w]hether the physical environment of [Mother's] home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent consistently unable to care for the child in a safe and stable manner[.]" Tenn. Code Ann. § 36-1-113(i)(7). As we have already discussed, Mother's lack of affection, cold behavior, and inappropriate parenting would make it unhealthy and unsafe for Cyric to return to Mother's home. Further, Mother's home was not found to be suitable when Ms. Shaw visited. Therefore, we find that this factor weighs in favor of termination.

The eighth statutory factor is whether Mother's "mental health and/or emotional status would be detrimental to the child or prevent [Mother] from effectively providing safe and stable care and supervision for the child[.]" Tenn. Code Ann. § 36-1-113(i)(8). As previously stated, Mother repeatedly failed to properly address her mental health, which was the primary concern and most important aspect of the permanency plan. As a primary concern, Mother's mental health was also a primary barrier to the return of Cyric to her custody because of concerns of her ability to meet the needs of her child. Dr. Kay's diagnostic impressions of Mother were listed as obsessive-compulsive personality disorder with schizoid features, major depression (recurrent, severe, without psychotic features), and generalized anxiety disorder. Mother's mental health remains unaddressed, and as such, it remains a serious concern as to her ability to effectively provide for Cyric and for herself. Although we reversed on the ground of mental incompetence, we find that as long as Mother's mental health remains unaddressed, without appropriate therapy and possibly medication, it is in the best interests of Cyric to terminate Mother's parental rights. We find that that this factor weighs in favor of termination.

The ninth statutory factor is whether Mother "has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101." Tenn. Code Ann. § 36-1-113(i)(9). As we discussed in ground one, Mother was ordered in November 2019 to pay retroactive child support in the amount of $1,016.00 to be paid at $25.00 per month, and her payment of current child support was set at $259.00 per month. In December 2020, during the pendency of this case, the juvenile court found Mother in contempt for nonpayment of child support. In addition to a child support payment in the amount of $380.00 that she made at the time of the hearing in February 2021, Mother made three child support payments. From the time Mother was ordered to pay child support in November 2019, the June 2020 payment was the only payment Mother made in the entire eight-month period before the filing of the petition to terminate her parental rights in July

2020. Mother did not have to pay rent to live in her aunt's home, and Mother was employed and making $1,488 every other week during the four-month period preceding the filing of the petition. Moreover, Mother admitted that she made regular expenditures for pet food and cigarettes, and yet failed to budget support for her child as a regular monthly expense. We find that this factor weights in favor of termination.

We likewise conclude by clear and convincing evidence that termination of Mother's parental rights is in the best interest of the child.

## V. CONCLUSION

For the aforementioned reasons, we reverse the finding that DCS proved by clear and convincing proof that Mother's parental rights should be terminated due to her mental incompetence, but we affirm the ultimate termination of parental rights. Costs of this appeal are taxed to the appellant, Anna K.W., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE